OK. Thank you, Your Honor. I'm Mark Levy and I'm representing Devicor Products. With me at counsel's table is Jerry Gressel, the Associate General Counsel. We are appealing from two rejections that arose in reexamination proceedings in the U.S. Patent Office. The unusual situation here is that Forrester is the primary reference against one patent and then in the second case Forrester is on trial. In essence, that's close, although Forrester is a related patent. It's not the identical reference, but the disclosure is identical. So the reference is Forrester 055. Doesn't Forrester disclose everything but the swallowable material? Well, the answer is technically no. Forrester teaches that the marker can be made of a metal or it could be made of a polymer and that polymer is selected so that it can be imaged or is capable of being imaged. But that's the extent of the Forrester disclosure. The Forrester disclosure does not go into that the way to make that polymer imageable is to incorporate a radiopaque material into it. It leaves that aspect of the thing dangling. So we have got the two appeals. We've got 1413, which is the Fulton patent, and in both cases we're dealing with marking the location at which a breath biopsy has been taken. And in the Fulton patent, that marker is a polymer composition that has three properties. It is swallowable, it is radiopaque, and it is bioabsorbable. Doesn't NABI plug up the hole that Forrester doesn't fill? Your Honor, we would say no, absolutely not, for several reasons. NABI is using a swallowable material in a punch-like apparatus in order to take a skin biopsy. The question is whether NABI is a one or two reference. We're talking about obviousness here. You've got a method for marking a biopsy site, providing a swallowable body, removing a specimen, inserting the body. There isn't a lot to it, except after you look at Forrester, and then you've got the swallowable body. Well, I guess the other point that you've got, though, is you do have a swallowable body in NABI, but you really don't have any motivation, you don't have any real teaching that says that within the context of a breath biopsy, you need a swallowable material. Obviously, when you're taking a biopsy from the outer skin and the like, we all know how we bleed when we're cut. Hemostasis is very critical, and the objective of NABI is let's take this biopsy without using a suture, and in order to do that, we're going to put this swallowable material in there. But now, how do we get to the point where we say, okay, now we're doing a breath biopsy, now we're in the classic situation, we're doing a needle biopsy of a breath, and we've got the same problems, and we're going to solve those same problems the same way. That leap is missing from the record, that's missing from the prior art, and that is where the DEVACOR invention comes in. In other words, DEVACOR, and the other thing, too, to keep in mind is... So the invention here is this idea, that you've got the idea to do it, it's not how you do it, the how-to. The materials to do it with are in the public domain, so to speak. In other words, swallowable polymers are known. We don't deny that. But this court has on many occasions pointed out that merely having the materials available is not enough to render an invention obvious. Yeah, but these are all in the same field, biopsies. You say they're all in the same field, but we're talking about a breath biopsy here, which is taken under very, very unique, carefully controlled from a number of different aspects, and with minimal invasion, versus a... the secondary reference is a punch. I mean, literally, it is a punch. Yeah, but you're not going to be able to find any cases in analogous circumstances. I mean, this is pretty close. If you look at our cases, I think, and the ones where we've said it's analogous art and it's analogous field, I don't know that I can think of any that would support your view in terms of the details of this being a different field, right? I mean, can you come up with anything? Do you think this is close to some other case that we said it was a completely different field? Well, Your Honor, no, but I mean, it's hard to find cases that match up like this. I mean, that would match in this type of situation, and I think that... I guess I have to come back again to the point that, again, we're talking about a breath biopsy, which, you know, conventionally, it's a very minimally invasive needle biopsy. And, in fact, there's no evidence in the record that swelling, hemostasis, is even an issue. In fact, if you look at the Forrester patent, the principal examples that Forrester puts forth for the marker are metals, and those metals clearly are metal elements, and those metal elements clearly don't have any hemostatic properties, but according to Forrester, they're perfectly fine. And if you look at the Forrester patent, in column one of the patent, Forrester makes a statement about the problems that accompany bleeding, the problems that accompany a biopsy versus tissue removal, and Forrester states, when you remove a tumor, you have bleeding problems. But Forrester completely leaves out, so to speak, the... I can direct you to that disclosure. But when Forrester is talking about the biopsy, Forrester does not get into any issue of hemostasis. I'm going to refer specifically to A267 in the record of the 1413 appeal. Nebai talks about hemostasis, doesn't he? But Nebai's got... Nebai's working on the open skin and is a different tissue, a different location, external versus internal. It's a problem of a very different nature. And again, going back to Forrester, he's using these metal elements and has no hemostasis problem in those situations. He also proposes to use a polymer, that a polymer could be used as the marker, but he certainly doesn't telegraph that we've got a need here to absorb the blood, that we've got problems that are flowing out of this, and hence we need to make this type of modification. There's the word flowing out judiciously. Yes. I mentioned the blood. But yes, and did you catch, anyway, my reference to Forrester and the absence of any indication that bleeding is a problem is that, is A267, it's column one, lines 44 to 50 of the Forrester reference. Since we're combining these cases and we're talking about Forrester, why doesn't Anderson pretty much take care of Forrester, which, as we recognize, Forrester doesn't have the swellable limitation. Right, it doesn't, and Anderson doesn't either. So that's neither here nor there. But Anderson, even though it talks about administering interleukin, it does so, and it goes into a tumor site and takes a biopsy and so. Well, in Anderson, yes, and one of the things that I find intuitively difficult to understand is how, when we're dealing with biopsies and we have tissues that we don't know whether they're cancerous or not, you would go and use an anti-cancer agent like interleukin-2, which is highly toxic. But apart from that, and probably even more importantly than that intuitive question, is that the Anderson process, the composition that Anderson developed is never positioned in a biopsy site. What Anderson does is he goes in and they use the example of brain surgery, but it could be surgery on any organ of the body. You're going to remove the tumor. You go in, you've got your tissue, the tissue is in the surgeon's eye. He needs to verify that he's got the right tissue before he goes and takes the entire tissue out. So he takes a small, what they call core localization biopsy. He grabs a little tissue, runs it down to the lab. They put it under the scope. They verify that he's got the right tissue and he comes back in and he completely removes the tumor. At that point in time, the surgery is being completed. The tumor is totally eradicated. The biopsy site doesn't even exist because, I mean, to the extent it was in that tumor initially and he's, you know, that little site where he verified that he had the right stuff, it's completely gone. And now he injects a chemotherapeutic agent into that. Now, that set of circumstances is so totally, in my mind, just so totally far removed from marking a biopsy site. That reference goes into, essentially, a biopsy site. And leaving out the, I mean, Anderson is a reference for everything it discloses. But everything that it discloses isn't the only thing that's disclosed. In other words, it goes into, I mean, this is not, not to demean the skill of surgeons. But this doesn't seem revolutionary. Well, to go into a biopsy site and to mark it with a biodegradable radiopaque polymer. Well, I think you also have to remember that these patents are going back a very long time. I mean, the Fulton patent, this was on its third re-examination. And these patents go back to the mid-90s. So I don't think you can apply today. You've got to be careful when you're dealing with patents that are this old to jump to conclusions in terms of how simple something may appear today versus as of the date these patents were filed. But again, I do think that to hold out that a reference that has nothing to do with marking a biopsy. And really has nothing to do with marking anything. And to say that a person of ordinary skill in the art would have been, with all these things available in front of him, him or her, would have picked up on that reference and said, ah, here's a problem in marking breast biopsies. And we're going to fix that problem using this as a spin-off of this interleukin-2 composition. I find to be a stretch. Plus NABI. Plus NABI, which is... Which doesn't have the interleukin. And which doesn't have the interleukin, but is also merely a hemostat, which there's no indication in the record is of any importance in a criticality. There's nothing in the primary references that show any criticality to controlling hemostasis within the confines of a breast biopsy. And indeed, as I say, we can't ignore the fact that Forrester is just putting little pieces of metal in there and not having any problem. So I think it's a large... And I think also we have to... We also have to ask the question again, though, whether this person of ordinary skill in this art would reasonably consider the subject matters of NABI and Anderson within the context of marking a biopsy, marking a breast biopsy. And these claims are specifically directed to marking breast biopsies and specifically to taking a biopsy, a breast biopsy sample. And as such, that brings into them all of the dimensions and considerations that go with that type of a surgical procedure. Okay, let's hear from the government. We'll save you a little time. I have a little bit more time, correct? You do? You have a fair amount of more time. Do you want to talk about the other appeals? I guess what I want... Well, we've really talked about both appeals already to some extent. And I think we do need to touch upon, in the 1414 appeal, the board's decision. And in that appeal, there are two procedural issues which we feel, which I think is pretty clear, were in violation of the rules and of 35 U.S.C. 6B. And that is that the first, I guess, issue that I would get to is that in rendering the decision in the 1414 case, the board developed its own rejection, a rejection that was premised entirely upon the Anderson reference, and one in which the board concluded that Anderson was broad enough, that the claim, that Atkins' claims could be construed as being broad enough to read on Anderson. That statement, that fact, that finding never appeared during the course of the prosecution of the application. Furthermore, early on in the prosecution of the re-examination of the Forrester patent, the examiner was confronted with a rejection over... The examiner made a rejection over Anderson, and the applicant responded to that rejection, and the examiner agreed that the applicant had overcome that rejection and withdrew it. So we've got the board adopting a, we've got the board rendering a decision in which the board sets forth a construction of the claims of the Anderson patent as reading on, or the construction of the claims of the Forrester patent as reading on Anderson, when in fact that very issue had been addressed earlier in the prosecution of the case and had specifically abandoned. So clearly, for it to come up in the board's decision here is a new issue. Secondly, the rejection that was actually in front of the board were two 103 rejections. One was a 103 rejection of the majority of the claims in the case over Nebai in view of Anderson and Lee, and the second rejection was a rejection of claims 8 and 12 over the combined teachings of Lee, Nebai, and Anderson. Now, when the board rendered its decision, it abandoned these two rejections. It abandoned both, the whole 103 analysis kind of went to the side, and the board justified everything that it did on the premise that, and in fact it concluded that, well, we're affirming the rejections because Anderson can be, Anderson, the claim one can be construed as reading on Anderson. So, in essence... Wait a minute, they went on to say, they threw Nebai in there. They did throw Nebai in there, but the analysis was a 102 analysis based on Anderson. So, I think, you know, and we never had a chance, you know, we had no chance whatsoever. Furthermore, in the examiner's answer, she specifically indicated that she was only relying upon Anderson to teach the radiopaque material. So, here we go from a situation where in the final rejection in the examiner's answer, Anderson is being relied upon solely as teaching a radiopaque material to a decision by the board in which Anderson now reads on, or Anderson is now held to teach every limitation in the claim. And that issue had, as I say, that issue was totally new. The second error that the board made was, we always had two rejections in this case. There was always the rejection of claims one and a number of the other claims, and then there was a second rejection of claims eight and twelve over Lee and Due of Nebai and Anderson. Those claims were, they appeared separately in the final rejection. They appeared separately in the examiner's answer. They appeared separately in the brief. And yet in the board's opinion, and yet the board decided that applicant had not separately argued the claim, and therefore the board on its own initiative combined them for consideration and selected claim one as being a representative of this group. Well, that action of the board was all premised, was premised under 31, let's see here, what is it? And 41.37C17 only permits the board to group claims and to select a representative claim, and it specifically says, for each ground of rejection applying two or more claims, the claims may be argued separately or a group.  The next sentence in 41.37C17 says, when multiple claims subject to the same ground of rejection are argued as a group by the appellant, the board may select a single claim from that group. Well, that is not what we had here. What we had here is two separate rejections, both under 103. In one case, the references were treated differently in both rejections and applied differently in both rejections. And the board, as I say, sui sponte on its own initiative and without any authority of this rule, combined the consideration of claim eight with claim one and rejected everything. And that appears to be clearly a violation. And as such, we should have an opportunity to go back and review. This case should have been remanded. Well, with respect to claim eight, we should have been given, the limitations of claim eight should have been considered by the board separately. If the board had considered those limitations separately, claim eight specifically calls for a procedure that is a percutaneous procedure. And the Anderson reference does not have anything with regard to percutaneous. I'm sorry to interrupt. But the problem I have with that particular argument is I thought you conceded in your brief that you didn't even reference the term percutaneous in your petition for review. Doesn't that end the inquiry? Well, I'll tell you. Throughout the prosecution of the case, we amended the claims. Am I right about that? It did not appear in the brief. It was raised at the oral hearing. It was raised at the oral hearing. And one reason it didn't appear at the brief was because in the original 103 rejections, the examiner had taken the position that the use of interleukin-2 in those compositions was optional. And we jumped all over that. And the examiner, with regard to Nabi, the examiner had taken the position that the claims could be construed as reading on a biopsy of the skin on the breast. And we pointed out a biopsy of the skin on the breast is a skin biopsy. It's not a breast biopsy. We jumped on that issue. So with the playing field one way, we responded to these 103 rejections and hit what we considered to be very, you know, some critical weaknesses. But it's kind of hard-pressed on appeal to be arguing that we ought to send something back to the board because they didn't deal with a particular limitation, where at least in your written presentation, you didn't cover that to the board. Well, if they, I think that if we, well, I think that if they had, if the board had, we also didn't concede that Claim 8 and Claim 1 should be grouped together and that Claim 8 should not be considered on its own merits. And Claim 8 clearly calls for, you know, a percutaneous procedure. So, you know, so we are, so we were really, we were really thrown a curve here by the board. We went from these 103 rejections to this 102 analysis. And the 102 analysis is only feasible if you ignore Claim 8, which the board conveniently did by grouping it with Claim 1. These types of maneuvers, I think, need to be discouraged. You know, we can only address the rejections as they're presented to us. And then to be confronted with this 102 analysis and to have a claim that was specifically amended to include the percutaneous limitation during prosecution and to have that just completely ignored and dropped out for everybody's convenience is an injustice. Okay. Thank you. Thank you, Mr. Levy. We have your rebuttal time saved. Mr. Johnson. May it please the Court. Opposing counsel is wrong when he says that a person of ordinary skill in the art would not have known to conduct a breast biopsy in the 13 appeal. Forrester teaches that particular aspect of Claim 1. And this Court is completely correct that Forrester teaches everything that's in Claim 1 except for the swallowable limitation. Anderson is the bridge that gets us to Nebai that teaches the swallowable limitation. Anderson teaches a biodegradable composition. And Forrester says that a biodegradable polymer can be used as a marker. Well, when you look at Anderson, which mentions the biodegradable composition, Anderson says that the composition can include a hemostatic agent. Nebai teaches a hemostatic agent. And it teaches that the benefit of having this hemostatic agent is that it controls bleeding. So one of ordinary skill in the art, seeing the clear teachings of Anderson, would want to rely upon the swallowable material that's in Nebai and combine that with Forrester. Once those references are all combined, then the claim would be rendered obvious based upon those three teachings. Of course, Mr. Levy says, what tells you to combine them? Where's the motivation? The motivation comes from Anderson itself, Your Honor. Forrester teaches that the biodegradable marker can be a biodegradable composition. Anderson teaches a biodegradable composition. And Anderson says that that biodegradable composition can include things like hemostatic agents and radiopact markers. Nebai teaches a biodegradable agent, which is hemostatic. It's a swallowable material. So the person of ordinary skill in the art would be motivated to rely upon Nebai's swallowable material because of the teachings in Anderson. Anderson is that bridge that gets us from Forrester to Nebai. Opposing counsel has argued that Nebai is not analogous art and neither is Anderson. However, they are both in the same field of invention. Both of those references deal with hemostatic agents. And that is exactly what the 205 patent was getting at. Anderson teaches that what you want to do is control bleeding after you cut into an individual because there could be hemorrhaging. Nebai also teaches that you want to control bleeding after a biopsy. One of the ordinary skill in the art, who's a doctor, would also know these things based upon his practice in the field. So both of those references are analogous because they are in the same field of invention. And not only for that reason, but also because they also dealt with the problem that the inventor was dealing with. The 205 patent expressly states that it deals with biopsies and localizing that area. Well, a biopsy is simply removing tissue. And that's exactly what Anderson is dealing with, removing tissue that's cancerous. And that's also what Nebai is dealing with, removing tissue that's cancerous. So because Nebai and Anderson deal with the same problem that the 205 patent was getting at, then they are also analogous for that reason as well. So there are two separate reasons why the references for this court are analogous art. And when you look at analogous art, KSR is also very broad in its discussion as to what can be analogous art. And here, clearly, those two references, Anderson and Nebai, are analogous for the reasons I just mentioned a moment ago. How about the second appeal? Anderson looks a little off the track. He's talking about injection of interleukin-2. It doesn't really deal with biopsies, does it? Well, Your Honor, biopsies is merely the removal of tissue, and you want to make some determination as to what it was that you removed. With respect to the IL-2, Anderson teaches a number of different embodiments in its specification, and explains with respect to one embodiment that you want to start with this biodegradable polymer, and then you add the IL-2. But you can also add other stuff. You can add hemostatic agents, and you can also add a radiopath marker. One of the lawyers still in the yard, who's merely conducting a biopsy, would know that he shouldn't add the IL-2 right off the bat. You can add the other ingredients that Anderson's talking about, the hemostatic agents and even the radiopath markers. With respect to the location of conducting a biopsy in the breast, Anderson is the reference that teaches it in the 14 appeal. Because with respect to Claim 1, the examiner relied upon Nabai, Anderson, and Lee. Well, Anderson clearly teaches that its biodegradable composition can be implanted into any section of the body, including the breast. What about the procedural aspects? New rejection? Yes, Your Honor. It's our position that there is no new rejection here. You just mentioned that the examiner relied on Lee, Nabai, and Anderson. The board, as I understand it, with respect to 1 and 8, relied predominantly on Anderson, but at least in combination with Nabai, no reference to Lee, right? Well, Your Honor, the board clearly understood what the rejection was. In its decision on rehearing, it specifically noted that the examiner relied on three different references. So it might not have identified the names of the three different references, but it clearly noted that the examiner, and I can point the court to that. The question is what the board relied on, not what the examiner relied on, right? And that's the problem. Yes, Your Honor. And here, at 814, at the very top in the first paragraph, the board states, in this case, the examiner relied upon the combined teachings of the three prior art references, including Anderson. So it specifically identified the fact that the examiner relied upon three different references. But the examiner was very specific as to why Anderson was being relied on, for example. And the concern that's been raised has been that if the board wishes to find a different rationale for the combination, that the applicant should have an opportunity to respond before the board or before the office through one of the procedures when new grounds are raised, rather than having to raise it before the court for the first time. That's correct, Your Honor, but I was merely pointing out the fact that the board clearly understood what the examiner's rejection was. That wasn't my question. What the board understood, the question is what the board states it relies upon, particularly in this case, it's quite conspicuous, when the examiner said she was relying on Anderson only for one aspect. I'll first start with that, because the examiner made a number of different findings, and one of the findings was that, and I can direct this court to the examiner's answer, and that's found at 836, where the examiner said that Anderson teaches a method of removing malignant tissue prior to implanting. That's one finding that it made, and it also indicated that the material may be injected into any desired site, such as the breast. That's another finding that it made. So you're saying that the examiner's answer can raise new grounds of rejection? No, I'm not saying that at all. What I'm merely pointing out is that the examiner made a number of different findings. What Devacor is pointing to is merely one of the findings. Yes, they're complaining that they didn't have an adequate chance to respond to the grounds on which the board relied. Yes, Your Honor. And from what I see, they have a good point. That would not be accurate, Your Honor, because they had an opportunity to address all of the examiner's findings with respect to Anderson when they received their final rejection. But I thought we were talking about Lee. I thought we were talking about the absence of Lee. Maybe I'm not positive whether Judge Newman and I are referring to the same thing, but my concern was that the examiner rejected based on Anderson, Devacor, and Lee, and then the board comes up and rejects Nebai and Anderson. Why isn't that a new ground for rejection? In this case, Your Honor, what the board was doing was merely relying to the arguments that were made in the brief to it. And in their brief to the board, most of their arguments were with respect to Anderson. Their focus was on addressing Anderson. And what they said, and the board was quite good in outlining each of the different points that Devacor raised, A4, they pointed out each of the different arguments that Devacor raised in their brief to the board. One of them dealt with Anderson is in a different field of invention. Anderson is not suitable for being a biopsy marker, and Anderson is not enabled. So they made a strategic decision to focus their brief just on Anderson. And it was the board's responsibility to respond to those arguments, and that's just what they did. They responded to each one of the arguments raised, and because they found that Anderson, the teachings in Anderson addressed each of the arguments, that's why their decision was limited to Anderson itself. But they also made findings, as this court has already noted, with respect to Nabai as well. And in their decision on request for rehearing, they pointed out that the examiner addressed three different references, and that was the decision that they were affirming. With respect to whether or not the claims were separately argued, Your Honor, the board correctly found that claims 8 and 12 were not separately argued. When you look at what they actually argued in their appeal to the board, they argued claim 1, and they did so properly. With respect to claim 8, what they did was they came up with two different paragraphs, and in the first paragraph, that first paragraph listed out different elements for their argument. Under the heading of claim 8 and claim 12. But nowhere in that first paragraph did they identify the percutaneous limitation, which they alleged to be the patentable limitation over claim 1. And then in their second paragraph, they argued, for the same reasons that we argued with respect to claim 1, we believe that there's no motivation to combine the different references. However, at no point at all did they argue in their first paragraph or their second paragraph the patentable limitation with respect to claim 8. They argued all the arguments with respect to claim 1. So the board properly found that because they didn't create any arguments with respect to the separate patentability of claim 8, that they had not separately argued claim 8 with respect to claim 1. All the board needed to do, in actuality, is simply point out, what they could have done, rather, is simply say, for the same reasons that we said claim 1 isn't patentable, neither is claim 8 and 12. They decided not to go that route, though. Well, that seems to have been an unfortunate omission by the time we get up here, right? Well, Your Honor, that was one possibility, but what they also did was proper, because Devercourt did not separately argue the patentability for claims 8 and 12. This case is closely aligned with Loving. And in Loving, they created a separate heading for some of the claims. However, they did not specifically argue the patentability of those particular claims. And this court found that because they did not separately argue the patentability with respect to those particular claims, that the board properly decided in that case. Just hypothetically, if an examiner relies on three references and has a rejection, a 103 rejection, based on a combination of those three references, and a case goes up to the board, and the board reevaluates, and it starts, and it uses just two of those three references, not the third, isn't that hypothetical typically viewed as a new ground for rejection? Your Honor, I think that it would depend, because there could be a number of situations, like the one we have here, where the board merely addresses the arguments that were made in the brief. And in doing so, if they determine that they only need to address two of the three references, then that would be satisfactory. Opposing counsel has pointed to our rule, but we believe that he has not actually accurately discussed our rule. Because the rule, although he pointed to basically half of the rule, the most important part, for our purposes here, is the part that was not discussed. And that begins with the sentence which states, notwithstanding any other provision of this paragraph, the failure of appellant to separately argue claims which appellant has grouped together shall constitute a waiver of any argument that the board must consider the patentability of any ground claimed separately. And any claim argued separately should be placed under a separate heading, and claims argued as a group should be placed under a separate heading identifying the claims by number. A statement which merely points out that the claim recites, what the claim recites will not be considered an argument for separate patentability of the claim. Can you just give us the site that you're reading from, just for purposes of clarity of the record? Yes, your honor, that's 37 CFR, section 41.37 C sub 7. Thank you. And the problem that Devercore has here is that they did not argue the separate patentability of claims 8 and 12. So for that reason, they have not satisfied what they're required to do as far as the rule is concerned in arguing claims 8 and 12. And our rules are established to ensure that there's an orderly process before the agency. By violating that rule, it just creates confusion as to the briefing process. And even if this court were to find that the board improperly decided the separate argument raised by Devercore, Devercore still has the problem in that they failed to argue the percutaneous limitation in their brief to the board. They had a number of opportunities to do so. The final rejection from the examiner pointed to Lee as the reference which teaches that particular limitation. They did not address that particular argument by the examiner in their brief to the board. They only raised it for the first time in their brief to the board. They did not address, I'm sorry, for the first time in their oral hearing, in their argument at the oral hearing. But they did not do so properly. What they said at the oral hearing was that we will address claims 8 and 12. And I point this out in a footnote. But they never came back to discuss it. So although they might have had an intent to do so, they failed to do so. But even if they had done so, it still would have been late at that time because they are supposed to raise all of their arguments in their brief to the board and they failed to do so with respect to that particular limitation. Any questions? Thank you. Thank you. Thank you. Thank you.  McDaniel is clearly pertinent to the issues that we have here today. McDaniel makes it very clear that the board cannot just do away with the examiner's rejections in spite of its obligations under 35 U.S.C. Section 6B. So regardless of whether per cutaneous was argued separately or not, the fact remains that the final rejection included, there were two 103 rejections. Claim 8 was moved and grouped with Claim 1 improperly. And under McDaniel, DEVACOR is entitled to consideration of the rejection of Claim 8 under 35 U.S.C. Section 6B. The other point I would like to make is that we've had a lot of discussion today with regard to the Forrester 055 reference as contrasted with the Lee reference in the 1414 appeal. The Lee reference only shows using a little air bubble to mark the biopsy site. So while Forrester may teach, well Forrester teaches metallic elements and the possibility of using polymers. In the 1414 case, the Lee reference is the only reference that relates to biopsy markers. And that marker is nothing more than a little bubble of air. And again, to make this transition, to make this leap from replacing a bubble of air to a polymer composition, whether it's described by Nabai or Anderson, seems to be a real stretch. Secondly, Anderson, I think it's an insult to the language to say that Anderson teaches a biopsy. I mean, Anderson does not teach a method for marking biopsies. Anderson mentions that he uses a tumor core localization biopsy, something that is conventionally used by surgeons all the time to make sure they've got the right tissue. But the Anderson patent is not directed to marking biopsies. Anderson is a chemotherapy that's designed to treat cancers using interleukin-2. The patents that teach marking biopsies are Forrester 055 with its elements and Lee with its little bubble of air. And particularly in the case of the rejection over Lee in 1414, you've got an enormous jump there to say, ah, it's obvious to replace this bubble of air with Anderson's interleukin-2 or Nabai's swallowable polymer that's being used in a punch for a skin biopsy. So I think on those bases, at a minimum, a remand of the 1414 case is appropriate. Thank you, Mr. Lee. Thank you, Mr. Lee and Mr. Johnson. The case is taken into submission.